**EXHIBIT 3**

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| AMERICAN MARITIME OFFICERS ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> JEROME E. JOSEPH ) <br> ) <br> Defendant. ) <br> ) | FILED UNDER SEAL -- <br> PURSUANT TO STIPULATED <br> PROTECTIVE ORDER <br><br> No. 02-CA-7178 <br> Calendar 4 - Civil I <br> Judge Herbert B. Dixon, Jr. <br> Next Event: May 16, 2003 Status <br> Conference |

## REPLY IN SUPPORT OF DEFENDANT'S
## RENEWED MOTION FOR SUMMARY JUDGMENT

Defendant Jerome E. Joseph ("Joseph") respectfully submits this reply in support of his renewed motion for summary judgment. As made plain from American Maritime Officers' ("AMO") opposition and related papers, there are no genuine issues of material fact in dispute and summary judgment should be entered for Joseph. Large sections of the affidavits of Thomas Bethel and Robert B. Rogers, upon which AMO principally relies in it opposition, must be stricken for a failure to comply with Super. Ct. Civ. 56(e). AMO is still unable, in opposing Joseph's renewed motion for summary judgment, to establish a *prima facie* case that wage and benefit information incorporated by reference into its collective bargaining agreements constitutes trade secrets worthy of protection under the Uniform Trade Secrets Act. AMO has no evidence of any actual or threatened misappropriation. AMO also has no evidence of any alleged causation of its claimed damages. Finally, AMO's theory of calculating its alleged quantum of damages necessitates summary judgment based on federal labor law preemption.

PLAINTIFF'S <br> EXHIBIT <br> 3

I. **STANDARD FOR GRANTING MOTIONS FOR SUMMARY JUDGMENT**

> It is well established that the moving party bears the burden of showing the absence of material issues. At this initial stage, the movant must inform the trial court of the basis for the motion and identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."
>
> Once the movant makes the required initial showing, the opposing party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." The burden is thus shifted to the non-moving party to make a *prima facie* showing of facts supporting each claim or defense. Unless the non-moving party counters the allegations of the moving party with specific facts, the motion for summary judgment will be granted.

Paul v. Howard Univ., 754 A.2d 297, 305 (2000) (citations omitted). AMO, in its opposition, failed to make a *prima facie* showing of facts supporting its claim. Hence, the Court should grant Joseph's motion for summary judgment.

II. **THERE ARE NO GENUINE ISSUES OF MATERIAL FACT IN DISPUTE**

   A. **While AMO Opposes Virtually Every One of Defendant's Statement of Material Fact, Most of the Opposition is, at best, Tangential or an Attempt at Obfuscation**

   > The opponent's statement of disputed material fact shall be stated in separate numbered paragraphs that correspond to the extent possible with the numbering of the paragraphs in the movant's statement of facts claimed not to be in issue. In determining any motion for summary judgment, the Court may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are asserted to be actually in good faith controverted in a statement filed in opposition to the motion.

Super. Ct. Civ. R. 12-I(k).

AMO did not controvert paragraphs 1-4, 11, 12, 17, 19, 22, 25, or 29 of Joseph's Statement Of Material Facts As To Which There Is No Genuine Dispute. Hence, those paragraphs are deemed admitted.

AMO's attempt to controvert paragraphs[1] 5-9, 13-15, 20, 21, 23, 24, 26-28, 30-40, 42, and 43 of Joseph's Statement Of Material Facts As To Which There Is No Genuine Dispute is unavailing. In virtually each one of AMO's "disputed material facts," AMO subtly (and sometimes not so subtly) avoids addressing the central premise in Joseph's statement of material facts. Instead, AMO attempts to recast or recharacterize Joseph's statement of material facts. Illustrative of AMO's deception are its responses to paragraphs 21, 26, 31, 40 and 42.

In paragraph 21, Joseph contended that AMO had no involvement with a ship management company's "overall bids after the AMO submitted its wage and benefits cost information." AMO counters by stating that certain individuals "were in contact with AMO-affiliated companies throughout the bidding process." AMO's statement misses the point -- that AMO had no involvement with a ship management company's overall bid.

In paragraph 26, Joseph contended that "AMO does not know what methodology, if any, Joseph used to create the Contribution Rate Sheet." AMO countered this statement by reference to Joseph's intended use of the Contribution Rate Sheet, and a general description of Joseph's base of knowledge he could have used to create the Contribution Rate Sheet. Noticeably absent from AMO's statement of disputed facts is an identification or description of any alleged methodology.

In paragraph 31, Joseph contended that "AMO has no evidence that Joseph had any Contribution Rate Sheets in his possession after leaving AMO." AMO countered this statement with a long tirade about the development of the Contribution Rate Sheets, Joseph's possession of

---

[1] AMO's attempt to controvert paragraphs 16 and 18, among others, is ineffectual because such attempt relies entirely upon portions of the affidavits of Thomas Bethel and Robert Rogers which must be stricken for failure to comply with Super. Ct. Civ. R. 56(e). See infra; Defendant's Motion to Strike Portions of Affidavits of Thomas Bethel and Robert B. Rogers.

other documents he inadvertently retained in a box in his basement after leaving AMO, and other unsupported conjecture about whether Joseph actually possesses a copy of that document.

In paragraph 40, Joseph contended that he had "not disavowed any confidentiality agreements . . . because he was never asked to sign one nor was he ever bound by one." AMO, in countering this statement, did not identify a single confidentiality agreement Joseph allegedly disavowed. Instead, AMO attempts to create legal fictions (that Joseph, as an agent for AMO, was personally bound by the Confidential Contribution Letters he signed) and cites to fiduciary obligations created by operation of law. Neither point directly addresses the undisputed material fact which was the focal point of paragraph 40. Hence, paragraph 40 should be deemed admitted.

Finally, in paragraph 42, Joseph contended that AMO affiliated companies won all five Military Sealift Command contracts. AMO admits that it won the contracts, but quibbles about the quality of the "wins."

As the foregoing illustrates, AMO has played fast and loose with its alleged statement of disputed material facts. The Court is asked to be particularly vigilant when reading AMO's statement of alleged disputed material facts and determining whether AMO has properly controverted any of them. Because AMO does not oppose Joseph's statements of material fact as to which there is no genuine dispute, as written, AMO's effectively concedes Joseph's statement of material facts, paragraphs 5-9, 13-15, 20, 21, 23, 24, 26-28, 30-40, 42, and 43.

> **B.    Large Portions of The Affidavits of Thomas Bethel and Robert B. Rogers, Upon which AMO Principally Relies in Its Opposition, Must be Stricken for Failure to Comply with Super. Ct. R. Civ. Pro. 56(e)**

As demonstrated in Joseph's Motion to Strike, large portions of the affidavits of Thomas Bethel (Paragraphs 5-9, 12-18, 20, 21-29, 32, 33, 37, 39 and 41-43) and Robert B. Rogers (Paragraphs 4-8) must be stricken for a failure to comply with Rule 56(e) because such sections

are filled with inadmissible hearsay, are not based on personal knowledge, and contain improper factual and legal conclusions and argument. Once those affidavits are appropriately stricken, large portions of AMO's statement of disputed material facts and its opposition brief are reduced to unsubstantiated allegations without admissible proof. See e.g. AMO's Statement of Disputed Material Facts, ¶¶ 5, 7, 8, 10, 13, 14, 16, 18, 27-34, 37, 40. As such, for each point AMO solely relies upon stricken affidavit allegations, summary judgment for Joseph is now appropriate.

### III. AMO HAS FAILED TO PRESENT A *PRIMA FACIE* CASE OF TRADE SECRET MISAPPROPRIATION

#### A. AMO Failed to Demonstrate that It Has Any Trade Secrets

##### 1. AMO Fails to Present Even a Single Case Where Union Wage and Benefit Information, Which is the Subject of a Collective Bargaining Agreement, Constitutes a Protectable Trade Secret

AMO is a labor organization, as defined by the Labor Management Reporting and Disclosure Act, as well as other federal labor laws. AMO does not refute the fact that the Confidential Contribution Letter information it seeks to protect as "trade secrets" is information that AMO incorporated by reference into (or is plainly stated in) its collective bargaining agreements. It is also undisputed that any AMO member has a right, pursuant to federal labor law and the AMO Constitution, to obtain a copy of all collective bargaining agreements. It is also undisputed that AMO failed to produce any written policies or rules or regulations governing AMO member conduct that limits an AMO members' use of such information.

Despite the overwhelming union and labor law flavor of this case, AMO fails to cite even a single case, under either the Uniform Trade Secrets Act or any other applicable statute or common law from any jurisdiction, finding that wage and benefit information specifically incorporated by reference into a union collective bargaining agreement constitutes a trade

secret.[2]  Such a failure is telling and suggests AMO is attempting an end run around federal labor law and its presumption that the terms of collective bargaining agreements shall be readily available to AMO members, for any use.  Members of AMO have a clear federal right to obtain any and all AMO Confidential Contribution Letters which were incorporated by reference into each collective bargaining agreement, irrespective of AMO's description of them as confidential and irrespective of Joseph's involvement in them while he was at AMO.  See 29 U.S.C. § 414; Simo v. Union Of Needletrades, Industrial & Textile Employees, Southwest District Council, 316 F.3d 974, 986 (9th Cir. 2003) ("under § [414], members of a local union are entitled to inspect all of the CBAs entered into by that union").  AMO's references to "confidential relationships", Opp. at 35, and an alleged estoppel argument, Opp. at 30, purposefully fail to take into account Joseph's, and others', federal labor law rights, as members of AMO, to the very information AMO now claims constitutes "trade secrets."  Similarly, Joseph's, and other beneficiaries', ERISA rights also mandate that AMO make available not only the CCLs (which are incorporated by reference into the collective bargaining agreements), but also information concerning the financial health and status of the AMO Plans.  See 29 U.S.C. § 1024(b).  Because Joseph, while he was a member of AMO and/or a beneficiary of AMO Plans, and all current AMO members and beneficiaries, have an unrestrained right to obtain and use the alleged trade secrets, none of the CCLs or information regarding the financial health and status of the AMO Plans can, by law, be a trade secret.

---

[2] Instead, AMO stubbornly clings to its Stipulation of Dismissal with the U.S. Department of Labor as binding legal precedent that all of its CCLs are trade secrets.  Opp. at 32-33.  As explained in Joseph's principal brief, the Stipulation of Dismissal, filed before AMO even filed an answer in the case, was hardly a decision on the merits and lacks any precedential or preclusive value.  To the extent it may have any residual precedential value, it would be applicable only to the specific CCL subject to the Stipulation of Dismissal.

### 2. AMO No Longer Contends That It Has A Trade Secret In Any "Unique Methodology, or Formula"

AMO, in its opposition to Joseph's renewed motion for summary judgment, jettisoned one of the focal points of its prior opposition to summary judgment. Before, AMO claimed that the CCLs and CRSs contained a "unique methodology, or formula" independently worthy of protection under the Uniform Trade Secrets Act ("UTSA"). AMO's 1st Opp. at 4. Now, AMO backpedals and makes no effort to claim that the CCLs were a product of any formula or methodology, let alone worthy of protection as a "trade secret." *See* AMO's 2nd Opp. at 29-35. Similarly, AMO only pays lip-service to the existence of any methodology or formula inherent in the CRS, *Id.*, at 28, and fails to identify or describe the alleged methodologies or formulae at issue. Because AMO's now jettisoned claim of "unique methodology, or formula" was the focal point of Judge Duncan-Peters' decision denying Joseph's previous motion summary judgment, Order at 6, there is no reason why summary judgment would not be appropriate now on AMO's failure to demonstrate the existence of a trade secret.

### 3. AMO's Own Evidence Demonstrates the Complete Lack of Predictability Between the CRSs and CCLs and Resulting Lack of Trade Secrets

In his principal brief, Joseph explained why the CRS could not constitute a trade secret because the actual wages and benefits negotiated by AMO in the CCLs did not correspond to any numbers, formulas or methodologies allegedly inherent in the CRSs. Memo at 7-10, 19. Documents attached to Thomas Bethel's affidavit submitted in opposition to summary judgment further demonstrate Joseph's point. Exhibits 2 and 3 to Bethel's affidavit contain various CCLs. Three of them, AMO 00457, AMO 01003, and AMO 01006, are CCLs signed from August 1999 to July 2002. Each of them lists an eighteen (18) day vacation entitlement. What is important from these three CCLs, however, is that **none** of the contribution levels for the vacation plan are

the same. Each is entirely different and the result of AMO negotiations with employers -- not the function of any trade secret. Given the complete inability to use the CRS to predict the actual negotiated vacation plan percentages, the CRS has no value as a trade secret and cannot be the subject of trade secret protection.

Similarly, the gross disparities of the benefits levels among these three CCLs further highlights the absurdity of AMO's argument that Joseph could know all of AMO's costs "instantly" by knowing the number of vacation days. See Memo at 10, 19. As Bethel admits, "AMO wage and benefits proposals are modified from time to time during the RFP/contract solicitation process and there is a continuing dialogue between AMO and its contracted employer-bidders." Bethel Aff., ¶ 30. Because the negotiated elements of AMO's CCLs are constantly changing and different from each other, such information cannot meet the definition of a trade secret. See e.g. Lexis-Nexis v. Beer, 41 F.Supp.2d 950, 958 (D.Minn. 1999) (Information is not entitled to "trade secret" status if it "will quickly become obsolete, thereby losing its independent economic value.").

    4.    **AMO Utterly Fails to Identify Any Particular Information Regarding "The Financial Health and Status of AMO Plans" That It Seeks to Protect As a Trade Secret**

Even at this late date, AMO has not articulated what aspects of information concerning the financial health and status of AMO Plans, other than information readily available to beneficiaries like Joseph pursuant to ERISA, AMO is seeking to protect under the UTSA. AMO, in its opposition, makes no apparent effort to claim that information concerning the financial health and status of the AMO Plans meets the definition of a trade secret. AMO cites no evidence of exactly what information concerning financial status of plans is at issue here or that Joseph allegedly possesses. Indeed, the only evidence AMO presents concerning the financial status of the AMO plans is Thomas Bethel's assertion that the AMO medical, pension, and MPB

plans are "fully" or "adequately" funded. Schrier Aff., Ex. 1 (Bethel Dep. at 89). These vanilla statements, readily ascertainable from information available to beneficiaries pursuant to ERISA or from AMO's U.S. Department of Labor LM-2 forms (see 29 U.S.C. § 431(c)) hardly constitute information worthy of trade secret protection.

In the complete absence of any indication as to the contours of the information AMO seeks to protect as a trade secret, AMO has failed to make a *prima facie* case of trade secret misappropriation with respect to any information regarding the "Financial Health and Status of AMO Plans." See e.g. Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 661 (4th Cir. 1993); Contract Materials Processing, Inc. v. Kataleuna Gmbh Catalysts, 164 F.Supp.2d 520, 533-34 (D.Md. 2001).

### B.  AMO Failed To Present Any Facts Supporting Any Actual Or Threatened Misappropriation of Trade Secrets by Joseph

Even assuming there were protectable trade secrets, AMO has no evidence of any misappropriation. It also presents no facts that could even lead to an inference of actual or threatened misappropriation.

#### 1.  AMO Cannot Establish a *Prima Facie* Case of Actual Misappropriation

AMO fails to establish a *prima facie* case of actual misappropriation because it cannot get around the undisputed timing and sequence of events and only offers supposition, instead. As AMO itself argues, "[a]t the same time Joseph was negotiating his contract with MEBA, MEBA suddenly undertook to lower by 33% the benefit contributions that all three maritime officer unions had agreed upon under the Tripartite Agreement." Opp. at 40 (emphasis added). The important point here is that AMO concedes MEBA's decision to lower its benefit levels and AMO's agreement to abandon the Tripartite Agreement occurred before Joseph had a signed contract with MEBA. MEBA proposed changes to the Tripartite Agreement on March 27, 2002,

AMO voluntarily agreed to amend or waive the Tripartite Agreement on April 2, 2002, and Joseph signed his consulting agreement with MEBA on April 9, 2002. Schrier Aff. Ex. 17; see also McKay Dep. 59 (AMO has no evidence that Joseph provided any advice to NMEBA before signing consulting agreement). Once the timing of MEBA's decision is laid bare, no inference of misappropriation arises.

Despite the undisputed time line, AMO nonetheless contends that MEBA's subsequent low bids on government RFPs gives rise to an inference of actual misappropriation. Again, the facts do not bear out this wild supposition. The Tripartite Agreement was an agreement among the three major maritime officer unions to provide <u>identical</u> total labor cost packages to ship management companies for particular government contracts. Once the three unions agreed to abandon the Tripartite Agreement for fear of losing out to a non-union competitor, the only direction for the labor cost proposals by the three unions was down, as illustrated by AMO's own independent decision to reduce its total labor cost proposal. All that AMO is left with is supposition that Joseph used or disclosed any alleged AMO trade secrets. AMO has no proof that Joseph actually disclosed or used any alleged AMO trade secrets.[3]

---

[3] All AMO can muster is that Joseph received a copy of MEBA's March 27, 2002 letter asking AMO and the International Organization of Masters, Mates & Pilots to abandon the Tripartite Agreement. AMO claims that, based on a fax legend, Joseph received the letter on April 3, 2002. Opp. at 22. This, however, is impossible because Captain Timothy Brown signed the letter on April 5, 2002, after the date on the fax legend. Weissman Aff., Ex. 6 at J0282. Hence, AMO has absolutely no evidence regarding when Joseph received this document, let alone whether he received it at any point prior to the April 25, 2002 meeting regarding the Tripartite Agreement or prior to any MEBA affiliate company bids on RFP's formerly covered by the Tripartite Agreement. In other words, AMO has no evidence of any misappropriation by Joseph.

### 2. AMO Cannot Establish a *Prima Facie* Case of Threatened Misappropriation

Joseph has made no threat to disclose or use any alleged AMO trade secrets. He has also not disavowed any confidentiality agreements or obligations to which he, as an individual, was a party. Joseph has never disavowed any potentially applicable fiduciary duty placed on him by operation of either District of Columbia or federal law. AMO does not claim otherwise in its opposition.[4]

The only support for any alleged threatened misappropriation offered by AMO is the fact that Joseph is a consultant for MEBA and that he has spoken with several ship management companies about providing deck officers. Opp. at 37-39. Neither explanation is persuasive.

First, Joseph's work as a consultant, by itself, is irrelevant to any claim of threatened misappropriation. As discussed in Joseph's Motion to Strike, Bethel's claim that "MEBA already employs other knowledgeable and experienced individuals who negotiate contracts" should be stricken for a lack of personal knowledge. See Memorandum in Support of Motion to Strike at 12-13. The fact that Joseph is being paid, as a consultant, at a rate greater than his former salary as an officer of AMO is also of no consequence. Joseph's compensation as a consultant is well within the lines of reasonableness for consultants in the Washington D.C. area and AMO produces no evidence to the contrary. Finally, AMO cites to Joseph's consulting agreement with MEBA which "requires" Joseph to provide "advi[ce] on matters regarding contract negotiations . . . and on all activities within the expertise of JEJ as may be requested by NMEBA." See Opp. at 17; Weissman Aff., Ex. 5, ¶ 1. Joseph, however, possesses extensive

---

[4] Instead, AMO insists that Joseph was bound by an obligation of confidentiality by virtue of the CCLs he signed explicitly as an agent and representative of AMO, and not in his individual capacity. Such a position is ludicrous, in light of the applicable federal law mandating unconditional disclosure of the CCLs to AMO members, like Joseph. See supra.

knowledge and experience concerning <u>all aspects of maritime labor relations</u>." Joseph's Statement of Material Facts, ¶ 5 (emphasis added). AMO assumes, without any factual support, that Joseph's consulting activities are limited solely to Deep Seas contracts and other matters covered by the CRSs and CCLs at issue in this case. There are many aspects to maritime labor relations that would not provide Joseph with any opportunity to misappropriate AMO's alleged trade secrets. By failing to identify or eliminate such alternative aspects of maritime labor relations, all that is left of AMO's argument is wild, unsupported supposition. Supposition cannot prevail on a motion for summary judgment.

While Joseph has spoken with representatives from at least one ship management company about providing deck officers, none of those discussions have been in the context of a "Deep Seas" commercial contract or government RFP - the explicit subject matter of the CRS and CCL at issue in this case. See Weissman Aff., Ex. 1 (Joseph Dep. at 193); Schrier Aff., Ex. 3 (Joseph Dep. at 205); Opposition To Plaintiff's Cross-Motion To Compel Defendant To Answer Deposition Questions And Opposition To Motion To Compel Defendant's Complete Response To Plaintiff's Third Document Request Number 1 at 4 (citing Joseph Dep. at 201:18-203:5). Because AMO has produced no evidence that Joseph has engaged in any discussions with any ship management companies on topics remotely related to the CRS, CCL or any other alleged trade secrets, AMO has not established a *prima facie* case of threatened misappropriation of an alleged trade secret.[5]

---

[5] This lack of evidence by AMO is particularly curious, in light of the Rule 56(f) affidavit submitted by its counsel. Surely, AMO could have spoken with the many ship management companies with which it has contracts and asked them whether Joseph had used or disclosed any of AMO's alleged trade secrets. See 4 Milgrim, Roger M., <u>Milgrim on Trade Secrets</u> § 16.01[5][i] at 16-16 (1996 & 2002 supp.) ("Care must be taken here because it is plaintiff's burden to show not only access but actual use" of trade secrets). But for one poorly drafted affidavit (Rogers) that must be stricken for a failure to comply with Rule 56(e),

### 3.  AMO Failed to Properly Plead "Inevitable Disclosure" of a Trade Secret

Despite Judge Duncan-Peters' decision finding the "inevitable disclosure" theory inapplicable, AMO takes another crack at it. Even if the Court were to disagree with Judge Duncan-Peters, AMO cannot prevail on an "inevitable disclosure" theory of trade secret misappropriation, assuming the District of Columbia were ever to adopt that theory.[6] AMO failed to properly plead "inevitable disclosure." As more fully explained in Joseph's original motion for summary judgment at 14-17, "[a]n allegation that the defendants said they would use secrets or disavowed their confidentiality agreements would serve this purpose. An allegation that [defendant] could not operate without [plaintiff's] secrets . . . would suffice." Complete Business Solutions, Inc. v. Mauro, 2001 WL 290196 (N.D. Ill. March 16, 2001) at *6 (*quoting* Teradyne, Inc. v. Clear Communications Corp., 707 F. Supp. 353, 356 (N.D. Ill. 1989)); see CMI Int'l, Inc. v. Intermet Int'l Corp., 251 Mich.App. 125, 134, 649 N.W.2d 808, 813 (2002) ("for a party to make out a claim of threatened misappropriation, whether under a theory of inevitable disclosure or otherwise, the party must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of

---

(Memorandum in Support of Motion to Strike at 16-19), AMO utterly failed to engage in this type of discovery. This helps confirm that AMO never really meant to protect its alleged trade secrets and that this whole case is nothing more than a form of retaliation against Joseph for being a candidate for AMO President in 2001.

[6] AMO's argument in support of the District of Columbia adopting the "inevitable disclosure" doctrine is flawed. Many of the jurisdictions cited by AMO in its brief (such as New Jersey, New York, North Carolina, Pennsylvania, and Texas) currently are non-Uniform Trade Secret Act jurisdictions. Among those cases that are from UTSA jurisdictions, AMO has generally failed to identify whether any of the decisions cited were pre- or post-adoption of the Uniform Trade Secrets Act. Because AMO failed to identify whether the decisions it cites specifically arise under the UTSA, such cases lack the persuasive authority AMO claims. See D.C. Code Ann. § 36-408 ("This chapter shall be applied and construed to make uniform the law with respect to trade secrets among the District of Columbia and those states enacting it.")

trade secrets."); Bendinger v. Marshalltown Trowell Co., 338 Ark. 410, 422, 994 S.W.2d 468, 475 (1999) ("the mere fact that a person assumes a similar position at a competitor does not, without more, make it inevitable that he will use or disclose trade secrets.").

AMO has not alleged that Joseph disavowed any confidentiality agreement (because he has none) or that Joseph could not operate without AMO's alleged trade secrets. AMO made no attempt, in its opposition, to correct or explain its pleading failure or to present any facts supporting such elements of an "inevitable disclosure" claim. All Joseph has done and all AMO alleges is that Joseph is providing consulting services to another maritime labor organization. This fact, by itself, is insufficient to establish inevitable disclosure. As such, summary judgment is appropriate.

### C. AMO Also Has No Factual or Legal Basis To Support its Damages Claims

#### 1. AMO Has No Evidence On Causation

AMO fundamentally mischaracterizes Joseph's motion for summary judgment as it relates to damages. The sole thrust of Joseph's motion was to expose the complete absence of any proof of causation for AMO's alleged damages. See D.C. Code § 36-403(a) ("Damages may include both the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss."). AMO, instead, seeks to convert this into a damages calculation question.[7] Opp. at 41-42. This intentional misdirection by AMO, to cover up the fact that it has offered no evidence of causation, should not be countenanced.

---

[7] AMO is disingenuous with its damages calculation (and not causation) argument, especially in light of the fact that the three unions abandoned the Tripartite Agreement and intentionally downwardly adjusted their total labor cost proposals to assist their affiliated companies better compete with non-union employer bids. Hence, AMO is disingenuous by claiming that Joseph was the reason "AMO was forced to drastically lower its bids [from the Tripartite Agreement] to remain competitive." Opp. at 41.

### 2. AMO's Method of Computing Its Alleged Damages Requires Federal Preemption of AMO's Claims

AMO's belated explanation of how it will compute its alleged damages, AMO's entire case is preempted by federal labor law. Preemption is mandated because AMO's claims will necessarily involve a review and analysis of the terms of the various collective bargaining agreements.

The Supreme Court has repeatedly recognized that Section 301 Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, is part of an important federal labor policy that is paramount to local rules of law. See Teamsters Local 74 v. Lucas Flour, 369 U.S. 95, 102-103 (1962); Textile Workers v. Lincoln Mills, 353 U.S. 448 (1957). Indeed, in enacting Section 301, Congress sought to establish a uniform system of federal law. "The dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute." Lucas Flour, 369 U.S. at 103. Specifically, notwithstanding how a claim may be characterized in the complaint, an action is nevertheless preempted if the claims are "substantially dependent upon analysis of" a Section 301 contract. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985). Indeed, the Supreme Court has noted with regard to Section 301 preemption that:

> Congress may so completely pre-empt a particular area, that any civil complaint raising this select group of claims is necessarily federal in character. For 20 years, [the Supreme] court has singled out claims pre-empted by Section 301 of LMRA for such special treatment.

Metropolitan Life Ins. Co. v. Tayler, 481 U.S. 58, 63-64 (1987) (emphasis added, citation omitted); see In Re: Glass and Pottery Workers Local 173, 983 F.2d 725 (6th Cir. 1993); Desantiago v. Laborers Local 1140, 914 F.2d 125, 127-28 (8th Cir. 1990); Pruitt v. Carpenters Local 225, 893 F.2d 1216, 1219 (11th 1990); Hunter Douglas, Inc. v. Local 159, 714 F.2d 342, 345-46 (4th Cir. 1983).

The preemptive force of Section 301 is so strong and complete that an action which is substantially dependent on analysis of the Section 301 "contract" (such as AMO's collective bargaining agreements) is preempted even if an otherwise adequate state cause of action may exist. Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 23 (1963); see Electrical Workers v. Hechler, 481 U.S. 851, 859 n.3 (1987). In other words, any such claim, even if characterized in the complaint as completely based upon state law, is considered from its inception to be a preempted federal claim. Caterpillar, Inc. v. Williams, 482 U.S. 386, 393 (1987); see also Smith v. St. Regis Corp., 850 F. Supp 1296 (D. Miss. 1994).

In the present case, AMO claims that it "was forced to drastically lower its bids to remain competitive." As a basis for calculating its alleged damages, AMO directs the Court to review the pre-April 2002 contracts and the post-Tripartite Agreement contracts AMO had with its affiliated ship management companies. Opp. at 41. In order to arrive at AMO's proposed calculation of damages, the Court would be required to review and interpret the terms and conditions of AMO's collective bargaining agreements and the reasons why AMO negotiated the collective bargaining agreements it did. See e.g. United Mine Workers v. Covenant Coal Corp., 977 F.2d 895, 899 (4th Cir. 1992)(claim against one company for allegedly interfering with collective bargaining agreement between union and another company preempted by Section 301 because determining interference required analysis of collective bargaining agreement); Milne Employees Assoc. v. Sun Carriers, Inc., 960 F.2d 1401, 1412 (9th Cir. 1992)(preempting state tort claims for tortious interference because interpretation of the collective bargaining agreement was necessary). Because of the nature of the damages AMO is seeking, AMO's claims are inextricably intertwined with the terms and provisions of collective bargaining agreements, i.e. a Section 301 contract, and as a result are preempted. Hence, AMO's UTSA claim must be

dismissed based on federal labor law preemption and summary judgment entered for Joseph on AMO's entire complaint.

## IV. Conclusion

For the foregoing reasons, Jerome E. Joseph respectfully requests that he be granted summary judgment as a matter of law and that AMO's complaint be dismissed in its entirety.

Dated: April 24, 2002

Respectfully submitted,

JEROME E. JOSEPH

By: /s/ Michael J. Schrier

Raymond C. Fay #188649
Michael J. Schrier #444693
BELL, BOYD & LLOYD PLLC
1615 L Street N.W., Suite 1200
Washington, D.C. 20036
(202) 466-6300

Attorneys for Defendant